IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ANGELA S. CARELAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21CV148 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Angela S. Carelas ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.     PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on October 16, 2018, alleging a disability onset date of October 1, 2012. (Tr. at 22, 189-90.)[2] Her application was denied initially (Tr. at 82-104, 128-32) and upon reconsideration (Tr. at 105-27, 134-37). Thereafter,

---

[1] Kilolo Kijakazi was appointed the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #7].

Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 138-39.) On July 16, 2020, Plaintiff, along with her attorney, attended the subsequent telephone hearing, during which both Plaintiff and an impartial vocational expert testified. (Tr. at 22.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 34), and, on December 23, 2020, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-6.)

II.    LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

2

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

3

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

_____

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled.  Id. at 179-80.  However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments."  Hines, 453 F.3d at 563.  In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job."  Hall, 658 F.2d at 264-65.  If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled.  Hines, 453 F.3d at 567.

III.    DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" between her alleged onset date, October 1, 2012, and her date last insured, December 31, 2016.  The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process.  (Tr. at 24.)  At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

degenerative disc disease and history of breast cancer status post lumpectomy[.]

(Tr. at 24.)  The ALJ found at step three that neither of these impairments, individually or in combination, met or equaled a disability listing.  (Tr. at 27.)  Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform light work with the following, further limitations:

[Plaintiff] was capable of frequently pushing and pulling with the bilateral upper extremities and with the lower left extremity.  [She] could never climb ladders,

5

ropes, or scaffolds and could occasionally climb ramps and stairs. [Plaintiff] could occasionally balance and stoop. [She] could frequently kneel, crouch, and crawl. [Plaintiff] could perform frequent but not constant reaching with the right upper extremity. [She] could perform frequent but not constant pushing and pulling with the right upper extremity. [She] could tolerate frequent but not constant exposure to workplace hazards such as unprotected heights and dangerous machinery.

(Tr. at 28.) Based on the testimony of the vocational expert, the ALJ found under step four of the analysis that Plaintiff's past relevant work as a nurse exceeded her RFC. (Tr. at 32.) However, the ALJ further determined at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 32-34.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 34.)

Plaintiff now challenges the ALJ's evaluation of the medical opinion evidence in formulating the RFC assessment. In particular, she contends the ALJ failed to properly consider the opinions of the State agency medical consultants, Drs. Karen Roane and E. Woods, the opinions of Plaintiff's orthopedic surgeon, Dr. Hunter Dyer, and the opinions of the State agency psychological consultants, Drs. Gary Nelson and Margaret Barham, in accordance with 20 C.F.R. § 404.1520c. Plaintiff also contends that the ALJ erred at step three of the sequential analysis by failing to properly evaluate Plaintiff's back impairment under 20 C.F.R., Part 404, Subpt. P, Appx. 1, § 1.04A ("Listing 1.04A"). Ultimately, the Court agrees that the ALJ's consideration of the opinion evidence, in the context of the evidence as a whole, fails to support the RFC in this case, as further discussed below.

6

Under the applicable regulations for claims filed on or after March 27, 2017,[5]

[The ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. . . .

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) Relationship with the claimant . . . [which includes]: (i) Length of the treatment relationship. . . (ii) Frequency of examinations. . . . (iii) Purpose of the treatment relationship. . . . (iv) Extent of the treatment relationship. . . [and] (v) Examining relationship. . . .

(4) Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

(5) Other factors. . . . This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. . . .

---

[5] In 2017, the Social Security Administration revised its regulations governing the analysis of opinion evidence. Under the new regulations, for claims filed on or after March 27, 2017, decision-makers must consider the persuasiveness of each opinion as set out above. Because Plaintiff protectively filed her claim on October 16, 2018, these regulations govern in the present case.

20 C.F.R. § 404.1520c(a) and (c). The regulations also require decision-makers to "articulate in . . . [their] decision[s] how persuasive [they] find all of the medical opinions . . . in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). Although all of the factors listed in paragraphs (c)(1) through (c)(5) of § 404.1520c should be considered in making this determination, the regulations specifically provide that the most important factors when evaluating the persuasiveness of an opinion are the first two: supportability and consistency. 20 C.F.R. § 404.1520c(a), 404.1520c(c)(1)-(c)(2). Therefore, paragraph (b) further provides that ALJs "will explain how [they] considered the supportability and consistency factors for a medical source's medical opinions . . . in [the] determination or decision." 20 C.F.R. § 404.1520c(b)(2). Express discussion of the remaining factors is not required. See 20 C.F.R. § 404.1520c(b)(3); see also Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017) (explaining that the final rules in § 404.1520c "require our [ALJs] to consider all of the factors" in § 404.1520c(c) "for all medical opinions and, at a minimum, to articulate how they considered the supportability and consistency factors" in determining persuasiveness). In other words, §§ 404.1520c(b)–(c) define the "minimum level of articulation" an ALJ must include in her written decision "to provide sufficient rationale for a reviewing . . . court." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01; see also Keene v. Berryhill, 732 F. App'x 174, 177 (4th Cir. 2018).

Accordingly, the question in the present case is whether the ALJ adequately addressed whether each of the medical source opinions at issue was (1) supported by the source's own records and (2) consistent with the other evidence in the record. See 20 C.F.R. § 404.1520c(b)(2); 404.1520c(c)(1)-(2). Notably, "the relevant regulations do not require

8

'particular language' or adherence to any 'particular format' in a decision, so long as the ALJ reasonably articulates her decision so that a reviewing court can 'trace the path of the adjudicator's reasoning.'" Boyd v. Kijakazi, No. 2:21CV29, 2022 WL 949904, at *2 (E.D. Va. Mar. 29, 2022) (internal citations omitted). Nevertheless, "whatever format the ALJ *does* choose must allow a reviewing court to discern an 'accurate and logical bridge' from the record evidence to the ALJ's conclusion." Boyd, 2022 WL 949904, at *3 (citing Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal citation omitted)). In particular, the ALJ must connect her discussion of the record evidence with her findings as to whether a specific source's opinions were consistent with and supported by that evidence. If this connection is not set out in a manner which allows the Court to "'trace the path' of the ALJ's reasoning," Boyd, 2022 WL 949904, at *3, the Court may not "fill in the blanks" in the ALJ's analysis, Allison E. B. v. Kijakazi, No. 2:21-CV-29, 2022 WL 955013, at *8 (E.D. Va. Jan. 31, 2022). Instead, where "this Court cannot meaningfully review how the ALJ evaluated the persuasiveness of [a source's] opinion and whether substantial evidence supports the ALJ's determination" remand is warranted for the ALJ to consider the supportability and consistency of the opinion "with the other evidence in the record, and to assess whether that opinion affects Plaintiff's RFC or ultimate disability determination." Id.

Here, the Court first considers Plaintiff's objections regarding the treatment of the opinion evidence related to her physical impairments. Specifically, Plaintiff challenges the ALJ's treatment of the opinion evidence from her treating providers, particularly her neurosurgeon Dr. Hunter Dyer. With respect to Plaintiff's degenerative disc disease, the ALJ noted that Plaintiff "underwent a L4-5 discectomy in October 2012 for disc herniation at L4-

9

5 with direct compression of the left L5 nerve root." (Tr. at 29.) Plaintiff noted some improvement following the surgery, but "presented in October 2016 with reports of low back pain after pulling her low back." (Tr. at 29.) "She reported new onset pain in her left leg and low back along with a left foot drop" and "[a]n MRI of the lumbar spine showed a foraminal disc herniation recurrent at the same level as her prior laminectomy." (Tr. at 29-30.) The ALJ noted further follow-up appointments in November 2016 and December 2016, reflecting pain, weakness, a left foot drop, and an abnormal EMG. The ALJ did not consider any evidence in the record beyond December, 31, 2016, Plaintiff's Date Last Insured. However, the evidence in the record reflects that Plaintiff continued to experience weakness and left foot drop, and ultimately underwent further surgery in 2019. Her neurosurgeon, Dr. Dyer, provided a Medical Source Statement that the ALJ considered as follows:

> Dr. Dyer noted that the claimant's symptoms go back to 2016. He opined that she could sit for 3 hours and stand/walk for less than 1 hour. He noted that the claimant could occasionally lift and carry up to 10 pounds. He noted that she would miss more than 3 days of work a month due to her conditions. Dr. Dyer opined that the claimant's condition met Listing 1.04 as she had a spine disorder with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limited range of motion of the spine, motor loss accompanied by sensory or reflex loss and positive straight leg raising test. He went on to note that he has treated the claimant since April 2019. These statements are not persuasive. Dr. Dyer did not treat the claimant during the period at issue and only began treating her in 2019. Notes during the relevant period indicate that the claimant healed well following her 2012 surgery, as she did not require any follow up orthopedic or neurological treatment until she injured herself in October 2016 (Exhibit 25F). Following this injury, exams from December 2016, immediately prior to her date last insured, revealed negative straight leg raises, and full range of motion of the spine (Exhibit 40F). The claimant testified that her foot drop healed on its own.

(Tr. at 31.) However, to the extent the ALJ discounted Dr. Dyer's opinion by characterizing the October 2016 injury as being resolved or healed prior to the Date Last Insured, that finding

is not supported by substantial evidence in the record. In support of that contention, the ALJ stated that exams revealed "negative straight leg raises, and full range of motion of the spine" prior to the date last insured, but the records from November and December 2016 also include positive straight leg raises (Tr. at 2056) and notations of limited range of motion (Tr. at 1757-58). Even more notably, the records also reflect that following her re-injury in October 2016, she was "unable to mobilize without assistance" (Tr. at 285), with 2/5 strength with her tibialis anterior and 0/5 extensor hallucis longus on the left (Tr. at 285) and with MRI results showing compression of the exiting nerve root at L4 or L5 (Tr. at 285-86) and "complete foot drop and severe nerve pain" with a recommendation for transforaminal lumbar interbody fusion (Tr. at 286). Records from November and December 2016 show "slow progress" with ongoing gait abnormality due to weakness (Tr. at 282) and with an abnormal EMG (Tr. at 2209) and significant weakness with a second opinion also recommending surgery (Tr. at 522), and with further injuries from a fall as a result of the ongoing weakness (Tr. at 510). Records from 2017 and 2018 further reflect persistent left foot drop (Tr. at 504, 506, 716, 1445, 1447), a repeated EMG in 2017 with similar abnormal results as the December 2016 study including continued significant reduction of motor recruitment (Tr. at 502), continued weakness and left foot drop with inability to move her toes (Tr. at 498, 500, 1516), and with some eventual improvement in strength but with increased pain and ongoing weakness and left foot drop (Tr. at 492, 493, 495). Records from 2019 reflect back pain with weakness in her left foot and some remaining complications from her left foot drop (Tr. at 1102, 1585-86), and an MRI in 2019 reflected recurrent left lateral disc herniation at L4-5 compressing the traversing left L5 root (Tr. at 1074), resulting in another surgery in 2019 by Dr. Dyer, with a notation of

Case 1:21-cv-00148-LCB-JEP   Document 19   Filed 08/31/22   Page 11 of 19

preoperative "chronic left foot drop" and remaining left foot weakness after the surgery (Tr. at 1117). Thus, the records reflect a severe injury and ongoing significant impairment from October 2016 forward, not a full resolution of the injury as characterized by the ALJ.

Similarly, to the extent the ALJ relied (repeatedly) on the contention that Plaintiff "testified that her foot drop healed on its own" (Tr. at 27, 28, 30, 31), it is clear from Plaintiff's testimony that she did not say that the foot drop healed; instead, she testified that physical therapy did not help to repair it, that it would have had to heal on its own, but that it did not ever heal and continued from 2016 through the time of the hearing in 2020. Specifically, Plaintiff testified that:

> The injury in October of 2016, I had a total left leg weakness and a total footdrop from the nerve damage from that disc herniation. It was extremely painful for me. I had a very unsteady gait. For a short -- for some time following that, I had to use a wheelchair and a walker which I had already had in my home from previous injuries. I was given a prescription for an AFO for the left foot that I did go and have made. I did physical therapy but still had a very unsteady gait during that period of time as well. . . . I did have a couple falls. . . . I did PT also during that time, but it did not help. The footdrop had to heal on its own, and this far out, I still have footdrop. It's not as severe as it was the day of the injury, but I still have footdrop today and I still have an unsteady gait today from that injury. That nerve damage. . . Following the 2016 injury, for about two years I was very almost immobile. Did not leave the home. Just stayed and did just nothing but recovery-type efforts.

(Tr. at 68.)   Plaintiff then detailed ongoing issues related to her degenerative disc disease, including a subsequent surgery in 2019, which was performed by Dr. Dyer. As noted above, Dr. Dyer's opinion specifically reflects that Plaintiff has recurrent lumbar disc herniation, that she continues to experience leg pain and partial foot drop, that she could only be seated for 3 hours in a workday and could stand or walk less than 1 hour in a workday, and that her symptoms/impairments and related limitations go back to 2016. (Tr. at 1884-85.)

12

To the extent the ALJ rejected Dr. Dyer's opinion because Dr. Dyer treated her in 2019, it is clear that Dr. Dyer had reviewed Plaintiff's past records in anticipation of the surgery, and had a basis for specifically opining that the impairment and symptoms went back to 2016.  Moreover, to the extent that the time of treatment was determinative for the ALJ, the ALJ failed to address the opinion evidence from Plaintiff's other treating physicians who treated her prior to the December 31, 2016 Date Last Insured.  For example, Plaintiff's orthopedic surgeon who treated her in 2011, 2012, 2016 and 2019, Dr. Brad Segebarth, provided a letter outlining the history of Plaintiff's condition and supporting her claim for disability dating back to 2011 (Tr. at 1974-75), and his treatment notes similarly reflect that he recommended fusion surgery in 2016, and when Plaintiff returned in 2019 with ongoing symptoms, he noted again that "she would be a reasonable candidate for transforaminal lumbar interbody fusion, as I suggested back in 2016, due to the persistent recurrent disk herniations at this level" (Tr. at 1732).[6]  Similarly, Plaintiff's primary care physician, Dr. Ashley Gaines, who treated her from 2011 through 2020, also provided a letter describing Plaintiff's recurrent symptoms, including ongoing lumbar radiculopathy with foot drop, from 2016 through 2017 and 2019.  Dr. Gaines noted that she agreed with Dr. Segebarth's letter supporting Plaintiff's claim for disability, and she also noted that Dr. Dyer had outlined Plaintiff's symptoms and the effect on her activities.  (Tr. at 2251.)  In addition, Plaintiff's

---

[6] Dr. Segebarth subsequently provided for the Appeals Council a further statement that Plaintiff's condition in October 2016 was "confirmed by both MRI of the lumbar spine and EMG studies," and that "[t]hese types of conditions typically do not spontaneously improve, which proved to be the case for this patient as evidenced by the fact that she underwent another left L4-5 microdiscectomy on May 11, 2019."  Dr. Segebarth further stated that Plaintiff's "significant severe condition" persisted from October 2016 forward, and that the ALJ's assessment of the medical records was "not accurate and [is] an incorrect evaluation of my medical records." (Tr. at 14.)

Case 1:21-cv-00148-LCB-JEP   Document 19   Filed 08/31/22   Page 13 of 19

physiatrist Dr. Welshofer provided an opinion statement in June 2020, opining that Plaintiff's lumbar degenerative disc disease caused Plaintiff profound and intractable pain that virtually incapacitated her, that activity such as walking and standing would increase the pain and would cause distraction from tasks or even total abandonment of tasks for 15-20% of an 8-hour workday, and that the conditions and limitations have persisted since 2012. (Tr. at 2249-50.) Thus, Plaintiff's primary care physician from 2011-2020 (Dr. Gaines), her orthopedic surgeon from 2011-2019 (Dr. Segebarth), her neurosurgeon from 2019-2020 (Dr. Dyer), and her physiatrist from 2019-2020 (Dr. Welshofer) all submitted letters or statements agreeing that her lumbar degenerative disc disease resulted in limitations that rendered her disabled, and that the condition had persisted since at least 2016 if not earlier, prior to the Date Last Insured. The ALJ did not address this opinion evidence or the other evidence in the record regarding the ongoing nature of Plaintiff's impairment when he rejected Dr. Dyer's opinion, and the ALJ does not explain how Dr. Dyer's opinion is not consistent with or supported by this evidence in the record. See also, e.g., Kee v. Berryhill, 1:15CV1039, 2017 WL 788306 at *6 and n.7 (M.D.N.C. Mar. 1, 2017) (remanding where Plaintiff's treating physicians were "the only medical sources to have opined on Plaintiff's condition after her second fusion surgery" and "the ALJ did not obtain the assistance of a medical expert to review the additional records"). While the ALJ is tasked with weighing the evidence of record, where the ALJ fails to sufficiently address the supportability and consistency of the opinion evidence, and where

the ALJ relies on potentially mischaracterized evidence, including as a basis to reject physician opinions, the Court cannot find substantial evidence supporting the decision.[7]

The Court notes that Plaintiff also raises objection to the ALJ's treatment of the opinion evidence regarding her <u>mental impairments</u>, and argues that an "ALJ may not substitute her lay opinion for the uncontroverted medical opinion of the only physician who opined concerning the effects of Plaintiff's mental impairments." (Pl. Br. [Doc. #13] at 21.) Specifically, Plaintiff challenges the ALJ's decision to reject the medical opinions of record regarding Plaintiff's mental limitations, and instead find Plaintiff's mental impairment non-severe at step two of the sequential analysis. Plaintiff notes that the two State agency psychological consultants, Drs. Nelson and Barham, both found Plaintiff moderately limited in concentration, persistence, and pace as well as moderately limited in adapting or managing herself. (Tr. at 31-32.) Based on these findings, the consultants opined that Plaintiff was able to maintain sufficient concentration, persistence, and pace to stay on task for 2-hour periods in an 8-hour workday, "as required to perform simple, routine, repetitive tasks." They also posited that, during the period at issue, Plaintiff was "able to adapt to changes in [simple, routine, repetitive tasks] in relatively stable work settings that are also relatively undemanding." (Tr. at 100-101, 124.)

Both at step two of the sequential analysis and in formulating Plaintiff's RFC, the ALJ rejected the consultants' findings. In doing so, she relied heavily on her own assessment of Plaintiff's mental impairments based on Plaintiff's testimony at the hearing. For example, as

---

[7] The Court notes that Plaintiff also raises a challenge to the ALJ's analysis of Listing 1.04, also based primarily on the ALJ's rejection of Dr. Dyer's opinion. This analysis overlaps with many of the issues noted above, and the Court need not reach that separate issue in light of the need for a remand to address the issues raised regarding the assessment of the opinion evidence.

to concentration, persistence, and pace, the ALJ noted that "[t]estifying at the hearing, [Plaintiff] followed the proceedings and stayed on point. She was capable of describing past job duties and provided detailed information about her impairments and their effect on her condition over eight years ago." (Tr. at 26.) With respect to understanding, remembering, and applying information, the ALJ noted that "[a]t the hearing, [Plaintiff] was capable of asking and answering questions and adequate explanations. [Plaintiff] was capable of describing past work activity and job duties." (Tr. at 25.)

However, the Court notes that while the ALJ can consider observations at the hearing in making credibility determinations, the ALJ appeared to go further here by rejecting evidence based on the ALJ's own observations and conclusions regarding Plaintiff's ability to concentrate. See Harris v. Colvin, 2015 WL 4921180 at *3 (W.D.N.C. August 18, 2015) ("At the administrative hearing, it is improper for the ALJ to reference and rely on his or her own observations in determining the claimant's mental and physical limitations." (citing Copeland v. Bowen, No. 88–2972, 1989 WL 90545, at *3 (4th Cir. Aug. 7, 1989)); Jenkins v. Bowen, 819 F.2d 1138 (table) (4th Cir. May 18, 1987) ("The ALJ is not a physician qualified to make such determinations. In addition to the obvious danger of unreliability, such an approach may encourage claimants to manufacture convincing observable manifestations of pain or, worse yet, discourage them from exercising the right to appear before an Administrative Law Judge for fear that they may not appear to the unexpert eye to be as bad as they feel." (internal citations and quotations omitted)); Parker v. Commissioner of Social Sec. 2013 WL 1338418 (D. Md. March 29, 2013) ("The record demonstrated that two physicians had found Ms. Parker to have limitations in the area of concentration, persistence, or pace. The only contrary

16

evidence was the ALJ's observation of Ms. Parker's ability to answer questions at the hearing, which lasted only approximately 25 minutes. Reliance on ALJ observation is disfavored under Fourth Circuit law, particularly in the absence of corroborating evidence."); Trudell ex rel. Bushong v. Apfel, 130 F. Supp.2d 891 (E.D. Mich. 2001) ("The ALJ based his decision finding no marked impairment in concentration, persistence or pace on two factors: comments contained in a report from the Arnold Center on Aaron's progress during a one-week work evaluation program, and the ALJ's own observations and interpretation of Aaron's conduct at the hearing itself. . . . More importantly, however, the ALJ's observations are not a proper basis upon which to rest a factual conclusion in this case. In assessing the credibility of a witness, personal observations are certainly important. In fact, it is one of the reasons underlying the preference for live testimony. . . . However, the ALJ's reliance on his personal observation in this case was more akin to those of a medical or psychological expert assessing symptoms of a patient or examinee, and then drawing conclusions therefrom. Traditionally, conclusions of the sort made by the ALJ with respect to Aaron's behavior require that the observer establish some expertise by skill, knowledge, education, training or experience, which does not appear in this record. Further, the ALJ's reliance on his personal observation in this case is analogous to the so-called 'sit and squirm' test, a procedure that has been thoroughly discredited and which cannot serve as a basis for the rejection of a claimant's allegations of disability." (internal citations omitted)).

The Court notes that the ALJ did also refer to Plaintiff's treatment records, but failed to acknowledge that, although mental status examinations generally revealed a euthymic mood during the early portion of the time period at issue, Plaintiff reported ongoing issues with poor

mood, poor energy, and anhedonia at nearly every mental health appointment between February 2015 and her date last insured in December of 2016. (See Tr. at 92-93, 831-32, 845, 858, 863, 869, 872, 874.) Plaintiff's treatment records from the relevant period also document extensive and ongoing medication changes in an effort to stabilize the symptoms of her depression and anxiety, as well as to control her insomnia. (Tr. at 856, 859, 860, 862, 863, 869, 872.) The State agency consultants, who considered and chronicled the above evidence in their reports, therefore found that "based on [the] totality of the evidence" in Plaintiff's file, her "mental impairments appear to cause more than mild limitations" as of her date last insured, and "would impose functional limitations on day-to-day activities." (Tr. at 93, 116.) Because the ALJ in the present case failed to fully account for the raw data from Plaintiff's treatment notes and relied primarily on her own evaluation of Plaintiff's mental impairments during the testimony at the hearing to reach her own lay conclusions, and then used these findings to discredit the opinions of the psychological consultants, it appears that remand would be required on this issue as well. See Lewis v. Berryhill, 858 F.3d 858, 869 (4th Cir. 2017) (citing 20 C.F.R. §§ 404.1529, 416.929 and remanding where the lack of medical support for the ALJ's conclusions "amount[ed] to the ALJ improperly 'playing doctor.'"); see also Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 108 (4th Cir. 2020) ("[T]he ALJ improperly substituted his own opinion for Dr. Harper's. An ALJ may not substitute his own lay opinion for a medical expert's when evaluating the significance of clinical findings."). The Court need not consider these issues further, given the ALJ's failure to adequately address the opinion evidence regarding Plaintiff's physical impairments, as set out above.

18

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g).  The Commissioner should be directed to remand the matter to the ALJ for further consideration of Plaintiff's claim in light of the above recommendation.  Defendant's Motion for Judgment on the Pleadings [Doc. #17] should be DENIED, and Plaintiff's Motion for Judgment as a Matter of Law [Doc. #12] should be GRANTED to the extent set out herein.  However, to the extent Plaintiff seeks an immediate award of benefits, her Motion should be DENIED.

This, the 31st day of August, 2022.


_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge

19

Case 1:21-cv-00148-LCB-JEP   Document 19   Filed 08/31/22   Page 19 of 19